Michael E. Geltner (MG1403)
Geltner & Associates, P.C.
Number Ten E Street, S.E.
Washington, D.C. 20003
(202) 547-1136

Dasil E. Velez (DV7356)
Greenberg Traurig, LLP
Metlife Building
200 Park Avenue
New York, NY 10166
(212) 801-6720
Attorneys for ePlus, inc.

Motion Date: December 18, 2003
2:00 P.M.
Courtroom 632

UNITED STATES BANKKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
_____

In re

METIOM, INC.,

                Debtor.
_____

Chapter 11

Case No. 01-12840 (RDD)

MEMORANDUM OF LAW IN
SUPPORT OF EPLUS, INC.'S
MOTION FOR ORDER SETTING
ASIDE OR LIMITING RULE 2004
EXAMINATION OF EPLUS, INC.

I.       Introduction

      ePlus is the owner of proprietary software which, in 2001, looked at buying the debtor's U.S. assets but, after due diligence, decided not to do so. On November 18, 2003, Trustee Bernard Katz served an application for a Rule 2004 examination on many parties, but not ePlus. The court signed the Trustee's order November 25, 2003. It was *ex parte* to ePlus, since ePlus had never been notified the order was to be presented to the court. The Trustee's application contained material factual inaccuracies. Based on the actual facts and the law, the Trustee does not have good cause for any examination of ePlus.

II.  Facts

In May, 2001, ePlus acquired the core of its software from ProcureNet.[1]  On July 30, 2001, after representations had been made to ePlus about the debtor's software and customer relationships, ePlus submitted a letter of intent to the debtor to acquire its U.S. assets for $2.1 million, subject to, *inter alia*, due diligence.[2]  ePlus then conducted due diligence.  In the course of due diligence, ePlus discovered that the debtor's customers were unhappy with the debtor, that several had asserted breach of contract claims against the debtor, that customers had the source code for the debtor's software, that one major customer had revised the software, which would complicate maintenance and support, that there were, by the debtor's employees' admissions, serious issues with, and bugs in, the current version 5 of the software, that the debtor's employees could not install and run the software on ePlus' servers, and that, based on ePlus' discussions with the debtor's staff, the software was not nearly as good as represented.[3]  For these reasons, ePlus decided not to go forward with the proposed agreement and so notified the debtor, although it discussed whether the source code for versions 4 and 5 of the software might be worth $100,000, ultimately concluding that such a purchase was also not feasible.[4]

Prior to ePlus' notification of debtor, its counsel was negotiating the terms of an asset purchase agreement, but, by the time ePlus decided for the reasons listed above that its inquiry had killed the deal, the asset purchase agreement had not been agreed upon, as ePlus' counsel had submitted proposed changes which the debtor had not accepted.[5]

---

[1] Parkhurst decl. ¶ 4.
[2] Geltner decl. ¶ 2.
[3] Parkhurst decl. ¶ 2.
[4] Parkhurst decl. ¶ 3.
[5] Geltner decl. ¶ 3.

While the asset purchase agreement was being negotiated, ePlus personnel conducted due diligence. The debtor conducted a demonstration of its software for ePlus at the debtor's office, essentially a functionality demonstration which would me made to a customer.[6] The next step in due diligence was for the debtor to install a copy of its source code on ePlus' server for examination. Three Metiom employees came to ePlus' Avon, Connecticut office on August 9, 2003 and tried to install the software.[7] ePlus employees Joe Ferro and Marvin Slayton were present.[8] The debtor's employees then spent the entire day trying <u>unsuccessfully</u> to install the software.[9] Having failed to get the software to run, the debtor's employees left with the CDs and other media, leaving no intellectual property behind.[10] The plan at the time was that they would return and try again, but this never happened[11] before the purchase was aborted by ePlus.

Because of the debtor's employees' failure to install and run the software, ePlus never had access to it. ePlus did not, and, for that reason, could not, steal or use the debtor's software.[12] Moreover, ePlus did not contract with the debtor's customers it learned about in due diligence.[13] ePlus' involvement with the debtor was what is commonly seen in a bankruptcy; the debtor's people told ePlus stories about its software and customers which did not pan out in due diligence, and ePlus walked away from the process having gained nothing.

The foregoing facts are at odds with the unverified version of facts which the Trustee presented to the court *ex parte* to get it to sign the Rule 2004 order. The application falsely states that there was a final agreement ePlus said it was ready to sign, falsely states that "the Debtor

---

[6] Ferro decl. ¶ 2.
[7] Ferro decl. ¶ 3; Slayton decl. ¶ 2.
[8] <u>Id</u>.
[9] <u>Id</u>.
[10] <u>Id</u>.
[11] Slayton decl. ¶ 2.
[12] Parkhurst decl. ¶ 4.
[13] Parkhurst decl. ¶ 4.

installed a version of its software on ePlus' servers, in anticipation of the sale of assets,"[14] falsely states that ePlus "continues to maintain possession of the installed software,"[15] and falsely states that ePlus "converted and misappropriated the Debtor's software, customers and other assets."[16] ePlus believes that, based on the actual facts, the court would not - - and should not - - have entered the Rule 2004 order, which contains an extremely broad document demand, including an examination of ePlus' own proprietary source code.

III.     Argument

Because the Trustee's application was presented to the court *ex parte* to ePlus with erroneous facts, there is no presumption that the order is to be enforced, and the court should consider this motion on its own merits. On a motion such as this, the burden is on the Trustee to justify the Rule 2004 order and its scope by showing good cause. See In re Silverman, 36 B.R. 254, 258 (Bankr. S.D.N.Y. 1984).

Despite its broad language, the limits of Rule 2004 have been established in several important cases. See In re Drexel Burnham Lambert Group, Inc., 123 B.R. 702 (Bankr. S.D.N.Y. 1991) ("Drexel"); In Matter of Wilcher, 56 B.R. 428 (Bankr. N.D. Ill. 1985) ("Wilcher"). The primary role of the Rule 2004 is to inquire into the affairs of the debtor and its assets, including whether the persons behind the debtor and any persons associated with them may have engaged in defalcations in connection with the debtor. Id. While the cases sanction a fishing expedition against such persons via Rule 2004, they place serious restrictions on "examination of a witness about matters having no relationship or no effect on the administration of an estate . . ." Drexel, 123 B.R. at 711 (courts uses analogy to fishing, stating that Rule 2004

---

[14] Application for Rule 2004 order, ¶ 7.
[15] Id ¶ 8.
[16] Id ¶ 1.

4

can "net the dolphins, as well as the tuna; however, the net, in the discretion of the court, can be carefully stitched to limit its catch.")

In the Northern District of Illinois' much followed Wilcher decision, the court examined the role of a Rule 2004 examination directed at third parties unassociated with the debtor or its principals and concluded it was narrow.  On its facts, the court refused Rule 2004 examination against an unrelated third party into whose affairs the trustee sought to inquire, because there was no showing that there was evidence of a valid claim against that party.  Wilcher, 36 B.R. at 434 (court holds that, where Rule 2004 examination of a third party is sought on the sole basis that it may have bought assets of estate, "Rule 2004 requires the court to exercise its discretion and balance the competing interests between the examiner's right to expose chicanery and [the third party]'s right to privacy in its business affairs." [citations omitted]).  Accord, In re Mesvinsky, 2000 Bankr. LEXIS 1067 (Bankr. E.D.Pa. 2000).  Wilcher has been repeatedly followed or cited approvingly in this district.  See In re CIS Corporation, 123 B.R. 488, 491 (S.D.N.Y. 1991) ("CIS"); Drexel, *supra*, 123 B.R. at 711.  See also In re W&S Investments, 1993 U.S. App. LEXIS 2231 at *6 (9th Cir. 1993)(follows Wilcher's requirement of "good cause" to examine third party); In re Dinubilo, 177 B.R. 932, 940, 943 (E.D. Cal. 1993)(same); In re Grabill Corp., 109 B.R. 329, 344 (N.D. Ill. 1989)(good cause required).

In CIS, the district court vacated a Rule 2004 order directed at a third party potential defendant which sought confidential, proprietary materials.  The district court held that, before a potential-defendant-third party could be put to the burden of disclosing proprietary materials, "…

a Rule 11 determination should be made that the Trustee has an adequate basis for filing a claim against [the third party]." CIS, 123 B.R. at 491 (citations omitted).[17]

Applying these principles, there is no basis for examination of ePlus, particularly an examination of its proprietary software. The Trustee obtained the order with no supporting proof, based on vague (and false) allegations that ePlus was given access to the source code for the debtor's software and may have misappropriated information from it. By contrast, ePlus has come forward with specific information under penalty of perjury that the source code was never installed on ePlus' servers and, therefore, never available to ePlus to copy. In addition, ePlus' declarations credibly deny the allegation of misappropriation and credibly explain the reasons why ePlus decided not to proceed with a purchase.[18] See Parkhurst declaration. These include the fact that, while the debtor was unable to install the 5.0 version of its software for ePlus to examine, many of the debtor's customers had, or had the right to, the source code for earlier versions, compromising its value. It is no basis for suit that a party who makes an offer to a bankrupt contingent on due diligence discovers in due diligence that the debtor's assets are not as represented and decides not to go forward. Indeed, the court should encourage such behavior, because, ultimately, the recovery of maximum return for bankrupts' assets is facilitated by a scheme in which potential buyers can examine such assets freely and is undercut if a recovery trustee is invited to chase a former putative buyer because it sensibly exercised the due diligence rights it preserved by agreement, and, after inquiry, pulled out.

---

[17] It is also the rule that, where proprietary materials are examined into, the Rule 2004 order should contain a broad confidentiality provision to protect the target's proprietary information from exposure to the outside. See In re Handy Andy Home Imp. Ctr., Inc., 199 B.R. 376 (N.D.Ill. 1996). There are no such restrictions in the order the trustee obtained against ePlus.

[18] When confronted with this evidence on the conference call between ePlus' and Trustee's counsel which preceded this motion, Trustee's counsel simply refused to identify his alleged conflicting information's source. Geltner decl. ¶ 7.

Conclusion

The Motion should be granted, and the court should sign the attached order. If the Trustee, in opposition, contends there is factual basis for its claim that ePlus had access to the source code for its software, the court should schedule an evidentiary hearing before deciding this motion.

Respectfully submitted,

  /s/ Michael E. Geltner_____
Michael E. Geltner (MG1403)
Geltner & Associates, P.C.
Number Ten E Street, S.E.
Washington, D.C. 20003
(202) 547-1136

  /s/ Dasil E. Velez_____
Dasil E. Velez (DV7356)
Greenberg Traurig, LLP
Metlife Building
200 Park Avenue
New York, NY 10166
(212) 801-6720

Of Counsel:
Erica S. Stoecker                            Attorneys for ePlus, inc.
ePlus Group, inc.
400 Herndon Parkway
Herndon, VA 20170
(703) 709-1947